THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN 256535)
5100 Campus Drive, Suite 200
Newport Beach, CA 92612
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Email; cameron@sehatlaw.com

Attorney for Plaintiffs, S.V., Naomi Bravo and EstebanViramontes.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.V., A Minor, Individually, And As Personal Representative Of The Estate Of Cristian Viramontes, By And Through Her Guardian Ad Litem, Elba Cervantes; Naomi Bravo, Individually, Esteban Viramontes, individually<br>        Plaintiffs,     VS.<br>COUNTY OF RIVERSIDE, a Governmental Agency; RIVERSIDE COUNTY SHERIFF CHAD BIANCO, in his individual and official capacity, Deputy DUNCAN, individually; Correctional Corporal CRAIG HARRIS, individually ; Correctional Deputy WILLIAM ROBINSON, individually ; Correctional Deputy JASON NGUYEN, individually; Correctional Deputy MIRANDA, individually ; JULIE COX, individually; NAJIA OUGZIN-MCILVOY, individually ; JOCELYN MENDOZA CID individually; DR. THOMAS MCNAHAN, M.D., individually and DOES 9-10 inclusive,<br><br>        Defendants. | Case No.: 5:23-CV-00860-SSS-KK<br><br>**FIRST AMENDED COMPLAINT**<br><br>**1. Deliberate Indifference to a Substantial Risk of Harm to Health (42 U.S.C. § 1983-14th Am. of U.S. Constitution &** *Gordon v. County of Orange* **claim )**<br>**2.** *Monell***-Failure to Train (42 U.S.C. §1983)**<br>**3.** *Monell***- Unconstitutional Custom, Practice and Policy -42 U.S.C. §1983**<br>**4. State Created Danger under the 14th Amendment**<br>**5. 14Th Amendment-Interference With Familial Relations - 42 U.S.C. § 1983**<br>**6. Negligence –Wrongful Death (State)**<br>**7. Bane Act C.C. 52.1 Et Seq. (State)**<br>**8. Failure to Summon Medical Care (California Government Code § 845.6)**<br>**9. Negligent Infliction of Emotional Distress (state)**<br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1.  Plaintiff, S.V., is a minor child and successor-in-interest to Cristian Viramontes, VIRAMONTES (hereinafter referred to as "VIRAMONTES" or "VIRAMONTES"). S.V.'s claims are asserted by and through her guardian ad litem, Elba Cervantes.

2.  Plaintiff, Naomi Bravo, is the mother of Cristian Viramontes, the VIRAMONTES. Naomi Bravo is also acting in an individual capacity.

3.   Plaintiffs, on behalf of VIRAMONTES, an inmate at the Robert Presley Detention Center, operated by the Riverside County Sheriff's Department, bring this action against the County of Riverside ("the County"), jail deputy DUNCAN Correctional Corporal CRAIG HARRIS, Correctional Deputy WILLIAM ROBINSON, Correctional Deputy JASON NGUYEN, Correctional Deputy MIRANDA, nurse JULIE COX, nurse NAJIA OUGZIN-MCILVOY, clinical therapist JOCELYN MENDOZA-CID, Dr. THOMAS MCNAHAN, M.D., and DOES 9 through 10 for monetary damages to redress for the VIRAMONTES' injuries and death resulting from Defendants' deliberate indifference to his constitutional rights and liberties. Plaintiffs bring this action under the Fourteenth and Eighth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to VIRAMONTES's health and welfare while in their custody. Plaintiffs further bring their 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon v. County of Orange et* al. *888 F.3d 1118*. Plaintiffs state a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident. This is a civil action seeking damages against the Defendants for committing acts under color of law, and depriving VIRAMONTES of rights secured by the Constitution and laws of the United States (42 U.S.C. § 1983). Defendants County of Riverside, Deputy an

correctional nurse and physician defendants including Robert Presley Detention Center management and employees including DOES "nine" through "ten", were deliberately indifferent by, without limiting other acts and behaviors: failing to provide medical care, failing to follow its established medical care and treatment protocol; failing to protect VIRAMONTES from harm; failing to provide necessary and appropriate medical treatment and, failing to provide necessary and appropriate personnel necessary for the health and welfare of VIRAMONTES, who at the time of death, was a pretrial detainee at the Robert Presley Detention Center, in the city of Riverside, California. Defendants deprived the VIRAMONTES's rights as guaranteed by the Fourteenth Amendments to the Constitution of the United States against cruel and unusual punishment.

4.   The Defendants, and the Robert Presley Detention Center (hereinafter referred to as "RPDC") medical officials, management and employees violated the VIRAMONTES's constitutional rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) deliberately ignoring and failing to heed to VIRAMONTES's serious medical condition, to wit, VIRAMONTES's and other inmate's numerous pleas for help including obvious symptoms of medical distress, physical pain and opiate withdrawal; (2) failing to assess VIRAMONTES after numerous complaints of severe pain and opiate withdrawal symptoms; (3) failing to refer to a medical doctor and failing to transfer to a hospital for diagnostic testing and emergency treatment; (4) failing to provide appropriate medication to treat severe symptoms of physical pain and opiate withdrawal; (5) failing to provide necessary and appropriate personnel for the health and welfare of the VIRAMONTES; (6) failing to train medical staff in symptom assessment of opiate withdrawals; and (7)  failing to implement policies and procedures on symptom assessment of opiate withdrawal. As a consequence of the defendants' actions, VIRAMONTES suffered debilitating physical and emotional injuries before he suffered from severe opiate withdrawal and ultimately his death, and

which action constituted a clear deprivation of his constitutional rights.

**JURISDICTION AND VENUE**

5.  This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the Eighth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and the death suffered by the plaintiff's VIRAMONTES at the hands of defendants.

6.  By a government claim form dated February 17, 2023, pursuant to Government Code §911.2, the County of Riverside, through its Clerk of the Board of Supervisors, was sent a Notice of Claim regarding violations of Plaintiff's VIRAMONTES's constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's VIRAMONTES's injuries.

7.  On March 9, 2023, the County of Riverside, through its Clerk of the Board of Supervisors, rejected the government tort claims of Naomi Bravo and Sofia Viramontes.

8.  This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

9.  At all relevant times, the VIRAMONTES was an inmate at the Robert Presley Detention Center operated by the Riverside County Sheriff's Department.

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

11.  At all times relevant to this complaint, Plaintiff, NAOMI BRAVO, is the mother of VIRAMONTES, and is an individual residing in Riverside County, California.

12.  At all times relevant to this complaint, Plaintiff, S.V., is the daughter and successor-in-interest to VIRAMONTES, and is an individual residing in Riverside County, California.

13.  At all times relevant to this complaint, VIRAMONTES was a non-

convicted inmate, also known as a pretrial detainee, who was housed at the Robert Presley Detention Center in Riverside, California, where he died.

14.    Defendant County of Riverside, hereinafter known as "COUNTY", is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law.

15.  The Riverside County Sheriff's Department is a duly organized public entity, form unknown, existing under the laws of the State of California and is responsible for supervising and operating the Robert Presley Detention Center, a correctional division, and ensuring the health and safety of all inmates and pretrial detainees incarcerated in its corrections facilities.

16.  Defendant DUNCAN, hereinafter referred to as "DUNCAN", is an employee of the Robert Presley Detention Center, located in the County of Riverside, and at times relevant to the complaint was employed in the capacity of a medical nurse at RPDC. Defendant DUNCAN is a duly authorized employee and agent of the Riverside County Sheriff's Office, and was acting within the course and scope of his perspective duties as inmate staff in the RPDC with the complete authority and ratification of his principal, the County of Riverside. Defendant DUNCAN is being sued in his individual capacity.

17.    Defendant Correctional Corporal Craig Harris, hereinafter referred to as "CPL. HARRIS" and formerly known as "DOE 1",  is an employee in the capacity of a jailer at the Robert Presley Detention Center, a subsidiary of Defendant County of Riverside, and at times relevant to the complaint was employed in the capacity of a jail deputy. Defendant is a duly authorized employee and agent of Robert Presley Detention Center, and was acting within the course and scope of her perspective duties as inmate jail staff in the RPDC with the complete authority and ratification of her principal, the County of Riverside. Defendant CPL. HARRIS is being sued in his individual capacity.

18.  Defendant Correctional Deputy WILLIAM ROBINSON, hereinafter

referred to as "ROBINSON" and formerly known as "DOE 2",  is an employee in
the capacity of a jailer at the Robert Presley Detention Center, a subsidiary of
Defendant County of Riverside, and at times relevant to the complaint was
employed in the capacity of a jail deputy. Defendant is a duly authorized
employee and agent of Robert Presley Detention Center, and was acting within the
course and scope of his perspective duties as inmate jail staff in the RPDC with
the complete authority and ratification of his principal, the County of Riverside.
Defendant ROBINSON is being sued in his individual capacity.

19.  Defendant Correctional Deputy JASON NGUYEN, hereinafter referred to
as "NGUYEN" and formerly known as "DOE 3",  is an employee in the capacity
of a jailer at the Robert Presley Detention Center, a subsidiary of Defendant
County of Riverside, and at times relevant to the complaint was employed in the
capacity of a jail deputy. Defendant is a duly authorized employee and agent of
Robert Presley Detention Center, and was acting within the course and scope of
his perspective duties as inmate jail staff in the RPDC with the complete authority
and ratification of his principal, the County of Riverside. Defendant NGUYEN is
being sued in her individual capacity.

20.  Defendant JULIE COX, hereinafter referred to as "COX", and formerly
known as "DOE 4",  is an employee of the Riverside County Healthcare Agency,
a subsidiary of Defendant County of Riverside, and at times relevant to the
complaint was employed in the capacity of a jail nurse at RPDC. Defendant is a
duly authorized employee and agent of Riverside County Healthcare Agency, and
was acting within the course and scope of her perspective duties as medical staff
in the RPDC with the complete authority and ratification of her principal, the
County of Riverside. Defendant COX is being sued in her individual capacity.

21.  Defendant NAJIA OUGZIN-MCILVOY, hereinafter referred to as "
OUGZIN-MCILVOY", and formerly known as "DOE 5",  is an employee of the
Riverside County Healthcare Agency, a subsidiary of Defendant County of

Riverside, and at times relevant to the complaint was employed in the capacity of a nurse at RPDC. Defendant is a duly authorized employee and agent of Riverside County Healthcare Agency, and was acting within the course and scope of her perspective duties as inmate medical staff in the RPDC with the complete authority and ratification of her principal, the County of Riverside. Defendant is being sued in her individual capacity.

22.   Defendant JOCELYN MENDOZA-CID, hereinafter referred to as "MENDOZA-CID", and formerly known as "DOE 6",  is an employee of the Riverside County Healthcare Agency, a subsidiary of Defendant County of Riverside, and at times relevant to the complaint was employed in the capacity of a jail clinical therapist at RPDC. Defendant is a duly authorized employee and agent of Riverside County Healthcare Agency, and was acting within the course and scope of her perspective duties as inmate medical staff in the RPDC with the complete authority and ratification of her principal, the County of Riverside. Defendant is being sued in her individual capacity.

23.   Defendant Correctional Deputy MIRANDA (officer ID no. N7790), hereinafter referred to as "MIRANDA" is an employee in the capacity of a jailer at the Robert Presley Detention Center, a subsidiary of Defendant County of Riverside, and formerly known as "DOE 7",  and at times relevant to the complaint was employed in the capacity of a jail deputy. Defendant is a duly authorized employee and agent of Robert Presley Detention Center, and was acting within the course and scope of his perspective duties as inmate jail staff in the RPDC with the complete authority and ratification of his principal, the County of Riverside. Defendant NGUYEN is being sued in her individual capacity.

24.Defendant Dr. Thomas MCnahan, M.D., hereinafter referred to as "DR. MCNAHAN", formerly known as "DOE 8",  is an employee of the Riverside County Healthcare Agency, a subsidiary of Defendant County of Riverside, and at times relevant to the complaint was employed in the capacity of a jail medical

doctor at RPDC. Defendant is a duly authorized employee and agent of Riverside County Healthcare Agency, and was acting within the course and scope of his perspective duties as inmate medical physician in the RPDC with the complete authority and ratification of her principal, the County of Riverside. Defendant is being sued in his individual capacity.

25.    The Riverside County Health Care Agency is a division of County of Riverside and is responsible for administrating medical care through its subdivision of Adult Correctional Health Services to inmates at the RPDC.

26.    DOES 9 through 10 are employees of defendant County of Riverside, and at all times relevant to the complaint were employed in the capacity of staff at the Robert Presley Detention Center. They are duly authorized employees and agents of the County of Riverside, and were acting within the course and scope of their perspective duties as staff in the Robert Presley Detention Center with the complete authority and ratification of their principal, Defendant County of Riverside. DOES 9 through 10 are sued in their individual and official capacities.

27.    At all times mentioned herein, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

## FACTUAL ALLEGATIONS

28.    VIRAMONTES was arrested and booked into the Robert Presley Detention Center on February 3, 2023.  He informed the medical screening nurse that he has a substance disorder, specifically that he was a 1 gram-a-day Fentanyl user.

29.    VIRAMONTES, while in the Robert Presley Detention Center, had merely been charged with a crime and had not been convicted of anything.

30.    Accordingly, he was a pre-trial detainee, and was thus guaranteed the right, under the due process clause of the Fourteenth Amendment, to proper medical care.

31.    From the time of VIRAMONTES' booking on February 3, 2023, until his death on February 5, 2023, VIRAMONTES continually complained to the medical staff that he was extremely ill. Not only did VIRAMONTES continually tell the nursing and correctional staff that he was extremely sick, but toward the tail end of his life, on February 5, 2023, begged to be taken to the hospital.

32.   Upon information and belief, VIRAMONTES informed the jail medical intake staff upon his admission, that he was a 1-gram a day fentanyl user. As such, jail staff ordered an over-the-counter opiate withdrawal protocol for VIRAMONTES' withdrawal symptoms. None of the medication ordered for VIRAMONTES included Suboxone, an opiate withdrawal agonist, despite jail medication administration records indicating prior orders to VIRAMONTES on prior bookings.

33.   The administration of Suboxone to inmates withdrawing from opiates meets the proper standard of care and ensures that inmate withdrawing can tolerate their symptoms.

34.   On the morning of February 3, 2023, shortly after being booked at RPDC, VIRAMONTES began suffering from opiate withdrawal symptoms. VIRAMONTES experienced increased body temperature, sweating, chills, tachycardia, muscle pain, shortness of breath, and hypertension. He immediately communicated his symptoms to both the correction and medical staff; however, such complaints were deliberately ignored for the next two days until his death on February 5, 2023.

35.   On the morning of February 4, 2023, VIRAMONTES again experienced muscle pain, shortness of breath, and other symptoms of opiate withdrawal. VIRAMONTES was seen by nursing staff at the Robert Presley Detention Center. The nurses assessed VIRAMONTES but had not administered Suboxone.

36.   At approximately 1:47 a.m. on February 4th, VIRAMONTES, nurse

Suarez, R.N. assessed him for his opiate symptoms and noted a COWS[1] score
(Clinical Opiate Withdrawal Symptoms) of "10" as his symptoms were severe
enough to warrant a phone call to an attending physician Assistant, Dr.. Henshaw.
VIRAMONTES' vital signs were also abnormal as he was tachycardic with a
"108" heart rate and pain scale of "4/10"

37.     Throughout the afternoon of February 4, 2023, VIRAMONTES
continued to experience agonizing symptoms and was going through opiate
withdrawal: he again voiced his complaints of severe muscle pain and overall
distressed condition to correction staff and nursing staff. VIRAMONTES
continued to suffer opiate withdrawal without being transported to a hospital.

38. On February 4th, DR. MCNAHAN is notified of VIRAMONTES' opiate
protocol but fails to order Suboxone or any opiate agonist despite
VIRAMONTES' known history of acute withdrawals, his moderate-to-severe
withdrawals, and a history of prior Suboxone administration and opiate
dependence.  In its stead, he orders Methocarbamol, Peptobismo and Donnatal,
none of which are designed to effectively address moderate to severe opiate
withdrawals. The administration of Suboxone for moderate to severa opiate
withdrawal comports with the standard of care for opiate withdrawal management.
A failure to provide Suboxone is tantamount to a denial of medical care in the
context of jail opiate withdrawal management.

39.  VIRAMONTES continued to suffer physical pain and mental distress due
to the increasing severity of his opiate withdrawal symptoms. Specifically,
VIRAMONTES suffered from bone pain, cold flashes, insomnia, vomiting,
shortness of breath, all of which should have been red flags to a trained nurse of
severe opiate withdrawal. VIRAMONTES was not transported to a hospital or to

---

[1] COWS which stand for "Clinical Opiate Withdrawal Score" is an assessment tool designed to
assess and score various categories of symptoms of opiate withdrawals including vital signs,
heart rate, pupil size, gooseflesh skin, vomit, diarrhea, chills, sweating, restlessness, bone or
joint aches, runny nose, tremor, GI upset, anxiety/irritability. The total score determines the
severity of the withdrawals, and whether a higher level of care is warranted.

an area within Robert Presley Detention Center where he could receive adequate medical treatment or under close monitoring.

40.  At all times relevant to this complaint, the nursing staff including COX, OUGZIN-MCILVOY and MENDOZA-CID blatantly failed to follow nursing standards and procedures regarding the assessment and treatment of VIRAMONTES' opiate withdrawals.

41.  VIRAMONTES continued to experience physical pain and mental distress due to opiate withdrawal symptoms. The medical staff at Robert Presley Detention Center did not address VIRAMONTES' concerns regarding his physical health, and VIRAMONTES was not examined to determine if VIRAMONTES was suffering from opiate withdrawal.

42.  Unsurprisingly, during the evening of February 4, 2023, VIRAMONTES' symptoms were only increasing in severity and consisted of vomiting, nausea, muscle pain and now, shortness of breath.

43.  Correctional staff placed VIRAMONTES back in his cell at Robert Presley Detention Center. He was complaining of cold flashes, diarrhea, vomiting, insomnia, shortness of breath, and muscle pain. VIRAMONTES also insisted and tried to explain to Defendant DUNCAN that his symptoms were becoming more unbearable. He was pleading for medical attention and begged Deputy DUNCAN to alert the medical staff about his increasingly severe opiate withdrawal symptoms. However, Defendant DUNCAN ignored VIRAMONTES'S complaints. Rather, Defendant DUNCAN assumed VIRAMONTES was malingering.

44.  VIRAMONTES continued to be the victim of reckless medical indifference. VIRAMONTES cried out for help numerous times, but Robert Presley Detention Center correctional staff members and nursing staff members told VIRAMONTES to stop faking his symptoms. VIRAMONTES continued to state that he could not breathe and that he suffered from shortness of breath. Once

again, despite obvious symptoms of a serious medical condition, VIRAMONTES
was left to his own peril.

## FIRST MAN-DOWN EMERGENCY

45.    At approximately <u>8:06 a.m.</u> on February 5th, VIRAMONTES gets the
attention of two deputies doing welfare checks. After a short conversation,
VIRAMONTES is escorted by several nurses including nurse OUGZILIN
MCILVOY and Licensed Vocational Nurse Renee Savedra who escort him to the
infirmary where they supposedly assessed VIRAMONTES.

46. Once VIRAMONTES arrives at the infirmary Defendants COX, OUGZIN-
MCILVOY and L.V.N. Renee Savedra conduct an assessment. However,
VIRAMONTES continues to suffer opiate withdrawal symptoms including
anxiety, nausea, vomiting, chills, shortness of breath, and muscle pain. His
withdrawal symptoms suffered became more severe at approximately <u>8:30 a.m.</u> on
February 5, 2023. Despites the pronounced symptoms, OUGZIN-MILVOY
deliberately fails to perform a COWS assessment much less keep him under close
observation; rather, she indicates in her soap notes: "*Unable to get vital signs at
this time, inmate is agitated and uncooperative during assessment*" and
deceptively notes *"No specific complaints".*  In light of claims of
uncooperativeness, the failure to take any COWS assessment, and no attempts to
reach a physician, Defendant COX concludes that he is "medically cleared". No
vital signs, heart rate, blood pressure nor oxygen saturation were taken. Anyone
one of these vitals would have revealed the severity of his condition including
symptoms hypoxia, an objective measure of shortness of breath.

47.    While VIRAMONTES was at the infirmary, he specifically begged the
nurses for Suboxone[2] yet no call was placed to any provider to request the same
despite VIRAMONTES having been admitted at the jail for over two days. A

---

[2] Suboxone is an opiate agonist and is one of the main medications used to treat moderate to
severe opioid withdrawals. Use of Suboxone is shown to lower risk of fatal overdose and
effectively manage severe withdrawal symptoms.

quick check of VIRAMONTES' Medication Administration Record would have alerted Defendants of a prior 30-day course of Suboxone administered from November 21, 2019 to January 2, 2020.

48.   Despite showing signs of severe withdrawals, VIRAMONTES was somehow "medically cleared" and taken to an interview room so defendant MENDOZA-CID, a behavioral health clinical therapist, can interview him. VIRAMONTES continues to complain of shortness of breath, requests Suboxone and begs to be taken to the hospital, stating *I am withdrawing from fentanyl, I want to go to the hospital to get medication ..I want to see a doctor, please*. Instead, MENDOZA-CID notes in her chart "*RSO notes consumer screaming and kicking*" even though she observes him as "*consumer presents as calm and cooperative with a flat affect, appears receptive*". As VIRAMONTES continues to exhibit clear signs of medical distress, including shortness of breath and involuntary contraction of his arms and hands, MENDOZA-CID advises him to engage in "*deep breathing*",  that "*he has just been seen by medical*" and "*to submit a kite with any further concerns*". Importantly, there were no indication of a doctor nor a provider contacted.

49.   VIRAMONTES is sent back to his cell at approximately 9:30 a.m. While inside his cell, VIRAMONTES continues to suffer agonizing physical pain, shortness of breath and severe distress due to his withdrawal symptoms becoming more severe over a short period of time.

50.   Other inmates are now concerned over VIRAMONTES' crippling physical distress and attempt to seek the deputies' attention including DUNCAN and others located in the deputy booth.  After numerous requests for medical assistance, even calling the deputy booth thru a dayroom intercom, other inmates including VIRAMONTES were repeatedly told by jail deputies including DUNCAN, CPL. HARRIS, NGUYEN, MIRANDA and ROBINSON that VIRAMONTES is faking his symptoms and that "he would be alright."

Meanwhile, no vital signs had been taken of VIRAMONTES to rule out any
claims of malingering nor to evaluate his shortness of breath amongst other
symptoms.

### *SECOND* **MAN-DOWN EMERGENCY**

51. Upon return to his cell, VIRAMONTES continues to endure symptoms of
moderate to severe withdrawals. Other neighboring inmates were attentive to his
condition, specifically, one by the name of Ruben Sanchez who decided to help
him take a shower as an attempt to mitigate his symptoms. However,
VIRAMONTES could not walk on his *o*wn nor enter the shower stalls after he
returned from the infirmary. VIRAMONTES' cellmate Sanchez assisted
VIRAMONTES by helping him walk to the shower stalls.

52. At or around 12:23 p.m., VIRAMONTES is seen exit the shower stall in a
frail condition as he continues to struggle to breathe. As Sanchez begins to help
dry him with a towel, VIRAMONTES collapses next to the shower stall.

53. Inmate Sanchez along with several other inmates frantically attempt to
seek the booth deputies' attention including DUNCAN but to no avail. After a few
minutes, Sanchez then picks up VIRAMONTES' frail body, carries him to the
threshold of the dayroom slider, places him down in a fetal position while
frantically attempting to alert the deputies of a second man-down emergency.

54. A few minutes later, at approximately 12:41 p.m., nursing staff including
COX and OUGZIN-MCILVOY and correctional staff including DUNCAN arrive
at the threshold and order VIRAMONTES to stand up. VIRAMONTES struggles
to get up on his feet and gets escorted to the infirmary, a second time.

55. Once at the infirmary, nursing staff COX, OUGZIN-MCILVOY again
medically clear him without taking any vital signs nor conduct any COWS
assessment. COX and OUGZIN-MCILVOY claim they were unable to take vitals
because inmate was "*overreacting, and unable to maintain proper positioning*"
yet deceptively chart: "*will continue to monitor*". And send him right back to his

cell. Defendants had dangerously made up their minds that VIRAMONTES was malingering yet failed to perform any testing, nor perform any differential diagnosis to rule out more severe conditions because they, Defendant nurses, had punitively decided that VIRAMONTES was not worthy of medical care due to his condition. Defendant nursing staff including COX and OUGZIN-MCILVOY repeatedly told a noticeably distressed VIRAMONTES that "he was fine" and "he should stop faking his symptoms".

56.    Defendant nursing staff's attitude toward VIRAMONTES rapidly spread to the defendant correctional deputies, whom they too began treating VIRAMONTES like he was "putting on a show".

57.    At approximately 12:53 p.m., as he was escorted back to his cell by defendants CPL HARRIS, NGUYEN, ROBINSON and MIRANDA, they momentarily stop at the dayroom slider before entering the housing unit. While they wait for the slider door to open, VIRAMONTES loses consciousness collapsing in front of the deputies.

58.    Shockingly, despite VIRAMONTES' deteriorating medical condition, defendants CPL HARRIS, NGUYEN, ROBINSON and MIRANDA lift his limp body off the floor, one carrying each limb, and take him[3] back to his cell.   The deputies did not attempt to request medical assistance nor alert the medical staff that VIRAMONTES needed immediate medical care, essentially leaving VIRAMONTES in his deathbed.

59.    VIRAMONTES' neighboring cellmate, Jeffrey Taylor described observing VIRAMONTES' limp body being carried back to his cell, stating that "*he looked dead already*". Accounts from other witnessing inmates indicate that VIRAMONTES looked "pale" with a bluish discoloration which a telling sign  of oxygen deprivation or hypoxia.

---

[3] Based on a review of jail surveillance video, housing video captured CPL. HARRIS escorted three deputies, defendants NUGYEN, MIRANDA and ROBINSON carrying VIRAMONTES' limp body back to his cell.

60.     Once CPL HARRIS, NGUYEN, ROBINSON and MIRANDA entered the cell, they shockingly prop up VIRAMONTES' limp body against the back wall on the lower bunk and leave him in the cell, locking the door behind him.

### ***THIRD* MAN-DOWN EMERGENCY**

61.     Just a few minutes after defendants propped up his limp body, inmate Taylor hears a loud thump which he believes was VIRAMONTES hitting his head against the side of the bunk. Taylor immediately notified DUNCAN thru his cell intercom of this third man down alert, but was repeatedly told by a nonchalant DUNCAN that VIRAMONTES was  *"alright, he has mental issues too and sometimes he'll be putting up a show"*. DUNCAN who was sitting in his booth never checked on VIRAMONTES nor asked other deputies to check on his welfare before concluding that VIRAMONTES was "alright". Taylor urgently responded back to DUNCAN that "*he's not putting on a show!*" and "*I heard him hit his head hard!*". DUNCAN then responds "*he is alright, the nurse checked on his vitals*" which was a false claim since none of the nurses ever took his vitals.

62.     **At 1:03 p.m.**, approximately five minutes after he was told by Taylor of the 2nd man down, DUNCAN conducts a security check of the entire pod and stops by VIRAMONTES' cell. DUNCAN spends approximately 10 to 15 second peering into the cell window without opening the cell to confirm that he wasn't breathing even when he can clearly see VIRAMONTES' limp body but acts as if nothing had happened, and continues with his checks. Prior to walking away, DUNCAN looks over at the other neighboring cellmate, Eric Sepulveda, and tells him, "*I think he'll be alright*" and walks away.

63.     At 1:07 p.m., after DUNCAN finished his security checks, other inmates in the dayroom yet again attempt to waive down the deputy booth and alert DUNCAN that VIRAMONTES does not look good and appears unconscious. They even use the dayroom intercom to alert DUNCAN of the man down. However, DUNCAN never checks on VIRAMONTES' cell and casually remotely

unlocks his cell, at the request of concerned inmates so the inmates can do a welfare check upon VIRAMONTES.

64.   Once DUNCAN unlocks the cell door, two inmates rush in the cell and discover an unresponsive VIRAMONTES, with his torso resting sideways, closer to the bunk, having fell over from where it was initially propped, with his head resting in a crooked position. VIRAMONTES' cell mates continued to call for help after they saw VIRAMONTES was unresponsive and looked dead.

65.   What happens next is nothing short of a shock to one's conscience: after the frantic warnings by numerous inmates that VIRAMONTES was not moving and unconscious, DUNCAN orders the inmates to leave VIRAMONTES' cell and to lock the cell door behind them. DUNCAN never concerned himself of this third man down, nor summoned medical care to VIRAMONTES' cell.

66.   After the two inmates shut the door behind them, a third inmate now tried to alert the deputies including DUNCAN that VIRAMONTES looked dead by making a cutting gesture across his neck and pointed at his cell. Other inmates are frantically alerting DUNCAN thru the intercom that VIRAMONTES was not breathing to which DUNCAN responds: he is overreacting.

67.   VIRAMONTES' dire condition was so evident that Inmate Ezekile Juarez, who was on the phone with his mother, instructs her to immediately call the jail and notify them there is an unconscious inmate in his pod. A few minutes later the inmate calls back his mother but she tells him that despite alerting the jail operator, the jail personnel still was doing anything about it.

68.   Nothing was down until VIRAMONTES' dead body was discovered well over 55 minutes *after* inmate Taylor first alerted DUNCAN that he fell and not until after a nurse who was conducting sick calls came across his cell at **1:57 p.m.** and noted the discolored limp body of VIRAMONTES. At which point, another man down was called, but by then, it was too late. No amount of emergency cardio pulmonary resuscitation would make a difference as VIRAMONTES had

been in cardiac arrest and left dead for nearly an hour.

69.   Severe opiate withdrawal is diagnosable, and most importantly, preventable, if it is attended to promptly with proper medical diagnosis and care. It is preventable because as the symptoms become intolerable, a person will immediately summon 911 and be transported to an emergency department for timely interventional care. Sadly, VIRAMONTES never had a chance. The defendants' deliberate indifference to his serious medical condition had sealed his fate.

70.  In summary, VIRAMONTES experienced an agonizing seventy-two (72) hours of physical and psychological torture before he died, simply because the entrusted medical professionals and jail staff at Robert Presley Detention Center failed to carry out the responsibilities they took an oath to uphold.

71.   VIRAMONTES' numerous symptoms of opiate withdrawal were nothing short of an emergency requiring hospitalization and a level of acute care which was beyond the capabilities of the defendants. The symptoms which he endured for the seventy-two (72) hours preceding his death had not ameliorated but rather worsened, and should have been obvious not only to an untrained lay person, but certainly to three medical professionals.

72.  Defendant COUNTY'S correctional system failed VIRAMONTES in the worst of possible ways, that is, not only did it take away his freedom, it also took away his life.

73.   Correctional and medical staff have three basic constitutional obligations toward those who are involuntarily confined in their custody: access to food, safety, and basic medical care. Tragically, VIRAMONTES was denied his constitutional right to basic medical care.

74.   Upon information and belief, no medical tests were ever performed, nor did VIRAMONTES ever see a physician during the time he was incarcerated at Robert Presley Detention Center.

75.    Christian Viramontes died at 26 years of age.

### FIRST CLAIM FOR RELIEF

**Deliberate Indifference to a Substantial Risk of Harm
to Health (42 U.S.C. § 1983 & 14th Amendment of the U.S. Constitution,
(By Plaintiff S.V. Against all Defendants DUNCAN, and ROBINSON, CPL
HARRIS, NGUYEN, MIRANDA, COX, OUGZIN-MCILVOY, MENDOZA-
CID and DR. MNAHAN, and DOES 9-10)**

76.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1
through 75 of this Complaint with the same force and effect as if fully set forth
herein.

77.    From the time VIRAMONTES was booked into Robert Presley Detention
Center until the time of his death, the Defendants repeatedly denied
VIRAMONTES proper medical care in repeated violation of his 14th Amendment
constitutional rights.

78.    All Defendants were informed by VIRAMONTES and numerous
neighboring cellmates that he, VIRAMONTES, had a serious medical need and
required a higher level of care. VIRAMONTES was suffering from severe opiate
withdrawal and complication thereof, which could have been prevented had he
been closely monitored and promptly hospitalized.

79.    All defendants made several intentional decisions regarding the conditions
of confinement involving VIRAMONTES: defendants DUNCAN, ROBINSON,
CPL HARRIS, NGUYEN, MIRANDA, COX, OUGZIN-MCILVOY,
MENDOZA-CID and DR. MNAHAN chose to ignore dire symptoms as
evidenced by claims that he was "faking" or "exaggerating" without performing
any differential diagnosis nor any objective assessment of his symptoms to rule
out suspicions of exaggeration. Defendants COX, OUGZIN-MCILVOY,
MENDOZA-CID   and Dr. MNAHAN chose to ignore standard opiate protocols
which require medical staff to administer Suboxone, to closely monitor, to take

vital signs, to regularly administer COWS, and to hospitalize an inmate whose opiate withdrawals became unmanageable. Defendants DUNCAN, ROBINSON, CPL HARRIS, NGUYEN, MIRANDA chose to ignore signs of medical distress and ignore VIRAMONTES' welfare when they grabbed and carried his limp body back to his cell. If Defendant deputies were acting upon the medical staff's directions, Defendants DUNCAN, ROBINSON, CPL HARRIS, NGUYEN, and MIRANDA further made an intentional decision to ignore VIRAMONTES' obvious decompensated state and to ignore common sense which required defendants to promptly summon a higher level of medical care rather than carry him back to his cell, and to override any reckless instruction that VIRAMONTES "is faking" his symptoms or is "just fine".  Lastly, Defendants DUNCAN, ROBINSON, CPL HARRIS, NGUYEN, MIRANDA chose to further ignore cries for help and numerous man-down calls after VIRAMONTES collapsed into unconsciousness and was left dead and/or unconscious for over an hour before any jail staff responded to his cell.

80.  The decisions taken by all defendants placed VIRAMONTES at a substantial risk of danger, and risk of suffering severe harm and death because every Defendant was unequivocally informed that he was medical distress, he was visibly decompensated and had repeated struggled with shortness of breath.

81. Defendants failed to take any reasonable available measures to abate that risk, even though reasonable officials, including reasonable nurses and jailers in these circumstances would have appreciated the high degree of risk involved making the consequence of the Defendants' conduct obvious. Such available measures included summoning paramedics, referring to a higher level of care, close observation, summoning a physician, and transport to an emergency room.

82.  All of the Defendants knew there was a substantial risk to VIRAMONTES' health if his opiate withdrawal symptoms went untreated, but repeatedly denied him appropriate medical treatment.

83.   It was objectively unreasonable for the Defendants to ignore the numerous objective signs and symptoms of a serious medical condition, which said symptoms lasted at least seventy-two (48) hours. Any diligent nurse would have been apprised of the serious impending medical condition, and promptly summoned paramedics in order to hospitalize VIRAMONTES.

84.   As a result of the repeated denial of proper medical care, VIRAMONTES spent his time at Robert Presley Detention Center suffering unnecessary and excruciating pain culminating to his death.

85.   The denial of medical treatment exacerbated VIRAMONTES'S severe opiate withdrawal symptoms to the point where his life was placed in jeopardy.

86.   The Defendants, by ignoring VIRAMONTES in this situation and by failing to provide proper medical attention, acted with deliberate indifference to a serious health condition and the medical needs of VIRAMONTES.

87.   If VIRAMONTES is deemed to be a convicted inmate, the Defendants by their act of deliberate indifference in failing to provide medical care to treat the VIRAMONTES's serious medical condition, the conduct thereof constitutes cruel and unusual punishment in violation of the Eighth Amendment of the Constitution.

88.   If the VIRAMONTES is deemed to be a pretrial detainee, the Defendants by their act of deliberate indifference in failing to provide medical care to treat the VIRAMONTES' serious medical condition, the conduct thereof constitutes cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution.

89.   All Defendants were deliberately indifferent to the serious medical needs of VIRAMONTES. It should be adequately clear that a reasonable medical practitioner would comprehend that by denying medical care, VIRAMONTES was exposed to undue suffering or threat of tangible residual injury, which, in the end, proved to be fatal. The Defendant jail and medical officials intentionally

denied VIRAMONTES medical care by failing to treat, refer to a doctor, or transfer VIRAMONTES for a higher level of care, causing him to unduly suffer for approximately seventy-two (48) hours before dying.

90.   Had the Defendants and their employees, agents, and servants, not acted with deliberate indifference to the obvious and serious health needs of VIRAMONTES, and provided prompt medical attention, he would not have died.

91.   VIRAMONTES'S death was avoidable.

92.   Such acts and omissions of the Defendants violated VIRAMONTES'S constitutional rights guaranteed under 42 U.S.C. § 1983, and the Eighth and Fourteenth Amendments to the United States Constitution. The defendants knew that by failing to treat the urgent symptoms of opiate withdrawal, that it would lead to a fatality, but not before VIRAMONTES endured significant pain and agony during the period preceding his death.

93.   Accordingly, Defendants each are liable to Plaintiff S.V. both in an individual capacity and as successor-in-interest to VIRAMONTES' estate for compensatory damages including loss of life and opportunity of life, predeath pain and suffering, and punitive damages under 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

*Monell*-Failure to Train, Supervise and Discipline (42 U.S.C. §1983)
(Against Defendant SHERIFF CHAD BIANCO, COUNTY and DOES 9-10)

94.   Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 93 of this Complaint with the same force and effect as if fully set forth herein.

95.   At all relevant times to this complaint, SHERIFF BIANCO and DOES 9-10 had the duty and responsibility to train, hire, instruct, monitor, and investigate staff and discipline other Defendants as well as all employees and agents of COUNTY and RPDC.

96.  Defendant BIANCO and COUNTY knew that VIRAMONTES was a vulnerable inmate upon his booking admission and will have suffered from an emergency medical condition and that the Robert Presley Detention Center unit was not equipped to care for acutely ill patients. Given the known limitations of the Robert Presley Detention Center medical infirmary it was obvious that Robert Presley Detention Center jail and medical defendants would need special training in order to care adequately for medically unstable patients and to assess whether such patients should be transferred to the hospital.

97.  The Robert Presley Detention Center nursing and deputy staff had not been trained adequately in monitoring, documenting and assessing patients' acute medical conditions within the confines of a limited-care facility such as the Robert Presley Detention Center, and that this failure to train led to a substantial but fatal delay in VIRAMONTES's care, resulting in his death. Jail staff had not been trained on how to properly recognize signs of medical distress which is a requirement under Title 15 which advises County jail to implement welfare checks at a  minimum of once an hour and to look for signs of life and/or medical distress in an inmate.

98.  Despite COUNTY's general jail policy requiring that medically unstable inmates be seen by a doctor and transferred to a hospital for acute care, COUNTY had failed to train the Robert Presley Detention Center doctors and nursing staff adequately so as to recognize the urgency with which medically unstable inmates must be seen and assessed in light of the Robert Presley Detention Center's and limited medical facilities.

99.  Defendant COUNTY had a policy of relying on medical professionals without training them on how to implement proper procedures for documenting, monitoring, and assessing inmates for medical instability within the confines of the Robert Presley Detention Center amounting to deliberate indifference.

100.     Defendant COUNTY including the RPDC had in fact experienced eighteen (18) prior in-custody death, some of which as a result of substance withdrawals in the year 2022 which would have placed the COUNTY on notice of a constitutional obligation to provide close monitoring of medically ill inmates. Separately, because of the excessive number of in-custody death, the California Department of Justice initiated its own civil rights investigation into these in-custody deaths[4].

101.     As a result of the COUNTY's failure to adequately train and implement policies, VIRAMONTES was caused undeserved pain and agony all culminating in his death on February 5th, 2023.

## THIRD CLAIM FOR RELIEF

### *MONELL*- UNCONSTITUTIONAL CUSTOM, POLICY OR PRACTICE (42 U.S.C. §1983)

### (On behalf of the Estate of Christian Viramontes and Against Defendant COUNTY and 9-10)

102.     Plaintiffs hereby repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 101 of this Complaint with the same force and effect as if fully set forth herein.

103.     On February 23, 2023, just a few weeks after Christian Viramontes' death, the California Department of Justice launched its own civil rights investigation into the Riverside Sheriff's Office to look into a pattern or practice of unconstitutional policing amid 18 or so in-custody deaths that preceded Mr. Viramontes' death in the year prior.

104.     On and for some time prior to February 5, 2023, (and continuing to the present date) Defendants COUNTY deprived Plaintiffs' VIRAMONTES of the rights and liberties secured to them by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, in that said defendants and their

---

[4] See web article from the Office of the Attorney General https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-civil-rights-investigation-riverside-county

supervising and managerial employees, agents, and representatives, acting with reckless and deliberate indifference to the rights and liberties of Plaintiffs' VIRAMONTES and of persons in his class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized county custom, policy, and practice of: Acting deliberately indifferent to the serious medical needs of inmates and newly booked inmates when defendants failed to take any meaningful corrective measures despite being previously placed on notice of their egregious practices resulting in prior deaths. The following is a list of *Monell* violations:

(a)  Failing to implement policies and procedures on basic symptom recognitions and assessment of inmates who are in medical distress and suffering from severe opiate withdrawals including symptoms of shortness of breath, fever, and compromise lung functioning;

(b)  Routinely failing to train detention staff on the symptoms and assessment of inmates suffering from shortness of breath, and who are visibly decompensated and in medical distress.

(c)  Inadequately supervising, training, controlling, assigning, and disciplining employees including COUNTY Jail staff;

(d)  Routinely neglecting and ignoring gravely ill inmates and enabling the custom and practice of medically distressed inmates to rely upon themselves to seek emergency medical treatment;

(e)  Engaging in the custom and practice of discriminating against chronically ill inmates and withholding emergency medical treatment until an inmate is at a near-death condition;

(f)  Routinely preventing inmates access to medical doctors, due to a custom and practice of a failed booking policy;

(g) Routinely denying to treat more severe co-morbid medical conditions due to a "*one condition at a time*" medical policy.

By reason of the aforementioned policies and practices of Defendants and COUNTY, Plaintiffs have suffered the loss of their son and father, Cristian Viramontes.

105.    Defendant COUNTY, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiffs and other individuals similarly situated.

106.    By perpetrating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants COUNTY, acted with an intentional, reckless, and callous disregard for the well-being of VIRAMONTES and his constitutional as well as human rights.

107.    Furthermore, the policies, practices, and customs implemented and maintained and still tolerated by Defendants COUNTY were affirmatively linked to and were a significantly influential force behind the VIRAMONTES's death.

108.    As a direct and legal result of Defendants' acts, Plaintiffs have suffered damages, including, without limitation, past pain and suffering, loss of life, loss of opportunity for life, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

109.    As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiffs, successors-in-interest for VIRAMONTES, set forth that the defendants are liable to them for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiffs' deprivation

and injury as a result of the loss of the VIRAMONTES's support, company, comfort, counsel, familial relations, aid, association, care and services.

## FOURTH CLAIM FOR RELIEF
### 14th AMENDMENT-STATE CREATED DANGER
### (Asserted by Plaintiff S.V. Against Defendants DUNCAN, COX, OUGZIN-MCILVOY, MENDOZA-CID, DUNCAN, CPL HARRIS, MIRANDA, ROBINSON, NGUYEN and DOES 9-10)

110.    Plaintiffs hereby repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 109 of this Complaint with the same force and effect as if fully set forth herein.

111.    Under the Fourteenth Amendment, DECEDENT had the constitutional right to be free from defendants' affirmative action of placing him in a position of actual, particularized danger. In this case, defendants knew of DECEDENT's  medical distress and crisis, and of the numerous cries for help and man downs.  Several inmates told the jailers numerous times that he was in emergent distress and needed prompt medical attention, that he was struggling to breathe and eventually stopped breathing, and would be in grave danger if unattended.

112.    While in-custody, DECEDENT was in the defendants' care and custody, and as such, Defendants had an affirmative duty not to expose DECEDENT to more danger than he would have been prior to their encounter.

113.    By blatantly denying DECEDENT help for his medical crisis, when it is obvious he needed to be hospitalized, by taking Decedent who was visibly decompensated back into his cell,  by leaving him in a cell unmonitored and locking his cell door which prevented other inmates from rendering CPR,  all the while failing to monitor him, Defendants made an affirmative decisions which

placed the Decedent is a position far worse than he was before being placed into the custody and care of the defendants.

114.    Defendants' affirmative acts created a foreseeable risk that DECEDENT would be in grave danger and/or go unconscious without the proper medical treatment and referral to a higher level of care.

115.    Accordingly, Defendants each are liable to Plaintiff S.V. for compensatory and punitive damages under 42 U.S.C. § 1983 and the 14th Amendment, as well as for wrongful death damages.

## FIFTH CLAIM FOR RELIEF

## 14th AMENDMENT-INTERFERENCE WITH FAMILIAL RELATIONS
## (Asserted by all Plaintiffs Against all named individual Defendants and DOES 9-10)

116.    Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 115 of this Complaint with the same force and effect as if fully set forth herein.

117.    Cristian Viramontes had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with his mother, Naomi Bravo.

118.    Plaintiff  S.V. had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her Father, Cristian Viramontes.

119.    Plaintiff  Naomi Bravo had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as

to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her son, Cristian Viramontes.

120.    The aforementioned actions of Defendants and DOES 9-10, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Mr. Viramontes and Plaintiffs, and with purpose to harm unrelated to any legitimate law enforcement objective.

121.    As a direct and proximate result of these actions, Mr. Viramontes experienced pain and suffering and eventually died. Defendants thus violated the substantive due process rights of Plaintiffs to be free from unwarranted interference with their familial relationship with Mr. Viramontes.

122.  As a direct and proximate cause of the acts of Defendants, Plaintiffs suffered emotional distress, mental anguish, and pain. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Mr. Viramontes, and will continue to be so deprived for the remainder of their natural lives.

123.  As a result of their misconduct, Defendants are liable for Mr. Viramontes's injuries, either because they were integral participants in the use of excessive force and failure to provide medical care, or because they failed to intervene to prevent these violations.

124.  Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Mr. Viramontes and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to the individual Defendants.

125.  Plaintiffs bring this claim both individually and seek wrongful death and 14th amendment parental rights damages under this claim. Plaintiffs also seeks punitive damages and attorneys' fees under this claim.

## SIXTH CLAIM FOR RELIEF

# NEGLIGENCE

## (Against Defendants DUNCAN, CPL HARRIS, MIRANDA, ROBINSON, NGUYEN, COUNTY and DOES 9-10)

126.    Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 125 of this Complaint with the same force and effect as if fully set forth herein.

127.  Defendants DUNCAN, CPL HARRIS, MIRANDA, ROBINSON, and NGUYEN, and each of them, have a duty to operate and manage the Robert Presley Detention Center in a manner so as to prevent the acts and/or omissions alleged herein. Said defendants owed VIRAMONTES, as an inmate in defendants' custody, care and control, a duty of due care to protect his health and physical safety.

128.  Defendants DUNCAN, CPL HARRIS, MIRANDA, ROBINSON, and NGUYEN were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as jail deputies to VIRAMONTES. It was foreseeable that as a result of Defendants' acts and omissions, as described above, VIRAMONTES' symptoms of severe opiate withdrawal would worsen, resulting in his physical injury, suffering, and death. Defendants' breach proximately caused injuries and damages to VIRAMONTES as Plaintiffs claim herein.

129.  As a direct and proximate result of the defendants' aforementioned conduct, the Plaintiffs set forth that the defendants are liable to her for damages including but not limited to funeral and burial related expenses, and damages to provide for the Plaintiff's deprivation and injury as a result of the loss of VIRAMONTES' support, comfort, counsel, familial relations, aid, association, care and services.

## SEVENTH CLAIM FOR RELIEF

### BANE ACT C.C. 52.1 Et Seq. (State)

**(Asserted by S.V. individually and On behalf of the Estate of Cristian Viramontes Against all individual named Defendants, COUNTY and DOES 9-10)**

130.  Plaintiff hereby repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 129 of this Complaint with the same force and effect as if fully set forth herein.

131.  California Civil Code, Section 52.1 (*the Bane Act),* prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional rights. However, under *Reese v. Cnty of Sacramento, 888 F.3d 1030, 1042-4043 (9th Cir. 2018),* the Bane Act does not require the "threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation Alleged.

132.   Specific intent does not require a showing that a defendant knew he was acting unlawfully; reckless disregard of the right at issue is all that is necessary [5]*Luttrell v. Hart,* 2020 WL 5642613.

133.  On information and belief, Defendants while working for the COUNTY and acting within the course and scope of their duties, denied VIRAMONTES necessary healthcare that could have prevented his death. All defendants were deliberately indifferent toward VIRAMONTES when they chose to ignore his critical condition, and instead chose to treat him as a malinger when they ignored

---

[5] Per *Luttrell*, if a Plaintiff adequately pleads a claim for deliberate indifference which requires a pleading of reckless disregard, then he was sufficiently alleged the "intent" element required for the Bane Act. Under *Reese*, "a reckless disregard for a person's constitutional rights  is evidence of a specific intent to deprive that person of that right. Some courts such as *Polance v. California 2022 WL 1539784, at*4 (N.D. Cal. May 16, 2022)* have deemed the application of the Bane Act appropriate when there is a showing of deliberate indifference toward correctional inmates ("observing that "defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as the custody context makes that violation especially coercive" and collecting

his cries of distress and physically carried him back to his cell in his decompensated condition.

134. When Defendants committed the above acts, they acted with the specific intent required under the Bane Act. Defendants intentionally and spitefully committed the above acts to deny VIRAMONTES the necessary healthcare that could have prevented his death.

135. VIRAMONTES reasonably believed and understood that he was being denied the right to adequate healthcare.

136. Defendants successfully interfered with the above civil rights of VIRAMONTES and Plaintiffs.

137. The conduct of Defendants was a substantial factor in causing Plaintiffs' harms, losses, injuries, and damages.

138. Defendant COUNTY is vicariously liable under California law and the doctrine of *respondeat superior*.

139. The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for Mr. Viramontes and Plaintiffs' rights, justifying an award of exemplary and punitive damages as to the defendants.

140. Plaintiffs bring this claim as a successor-in-interest to the VIRAMONTES, and seek survival damages under this claim. Plaintiffs also seek punitive damages and attorneys' fees under this claim.

## EIGHTH CLAIM FOR RELIEF
### FAILURE TO SUMMON MEDICAL CARE - G.C. §845.6 AND §844.6
### (Against all Defendants)

141. Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 140 of this Complaint with the same force and effect as if fully set forth herein.

142.   California Government Code § 845.6 creates an affirmative duty for jail staff "to furnish or obtain medical care for a prisoner in his custody." VIRAMONTES desperately required prompt medical attention from Defendants Robert Presley Detention Center staff. Defendants had actual knowledge of VIRAMONTES'S need for immediate medical care and deliberately chose to not furnish VIRAMONTES with medical care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6. As a direct and proximate result of Defendants' acts and/or omissions, hereinabove described, VIRAMONTES suffered severe opiate withdrawal resulting in his untimely death.

143.  Defendants are liable for their employees' breach of their duty to summon required immediate medical care while acting in the course and scope of their employment under the doctrine of respondeat superior.

## NINTH CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff ESTABAN VIRAMONTES Against all Defendant DUNCAN, ROBINSON, CPL HARRIS, NGUYEN, MIRANDA, COUNTY and DOES 9-10)

144.  Plaintiffs repeat, re-state, and incorporate each and every allegation in paragraphs 1 through 143 of this Complaint with the same force and effect as if fully set forth herein.

145.  All Defendants were negligent in caring for CHRISTIAN VIRAMONTES on the day he died.

146.  At all relevant times to the incident, Plaintiff ESTABAN VIRAMONTES, brother of CHRISTIAN VIRAMONTES, was also concurrently housed at the RPDC as a pretrial detained on the same housing floor, just across from the pod CHRISTIAN VIRAMONTES was housed and eventually died. ESTEBAN VIRAMONTES was aware his brother was housed in the pod across from his unit

and was further contemporaneously aware of the man-down calls involving his brother, the second of which culminating into the death of his brother.

147.  As a result of discovering of his brother's death and the manner in which he was abandoned by the Defendants, Plaintiff ESTEBAN VIRAMONTES suffered serious emotional distress, including but not limited to mental anguish, fright, horror, nervousness, grief, anxiety, worry, shock and humiliation.

148.  The COUNTY is vicariously liable for the wrongful acts of Defendants pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employees' act would subject him or her to liability. During this incident, Defendants, including DOES 9-10 were acting in the course and scope of their employment a jailers and medical staff for COUNTY.

149.  Plaintiff ESTABAN VIRAMONTES brings this claim individually and seeks compensation for damages under this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against all Defendants and DOES 9 through 10, inclusive, as follows:

1.    For compensatory damages according to proof including predeath pain and suffering, loss of life, loss of opportunity for life, all damages belonging to the estate of Cristian Viramontes, and wrongful death damages to S.V. and Naomi Bravo, and compensatory damages to Esteban Viramontes.

2.    For punitive damages against the individual defendants in an amount to be proven at trial;

3.    For interest;

4.    For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988; and C.C. 52.1 et seq.

5.    For such further other relief as the Court may deem just, proper, and

appropriate.


**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial.


Date: October 29, 2023          THE SEHAT LAW FIRM, PLC


                                By*: /s/ Cameron Sehat*_____
                                Attorney for Plaintiffs,
                                S.V and Naomi Bravo, and Esteban
                                Viramontes